DAWSON *v.* DETWEILER.

1. BANKS AND BANKING—EMERGENCY LEGISLATION—STOCKHOLDERS' ASSESSMENT—TRANSFER OF POWER TO LEVY.
   Under the emergency banking act the power and authority to levy a bank stock assessment was transferred from the courts to the State banking commissioner (Act No. 32, Pub. Acts 1933, as amended by Act No. 95, Pub. Acts 1933).

2. CONSTITUTIONAL LAW—DETERMINATION OF NECESSITY FOR ASSESS-
MENT ON BANK STOCKHOLDERS.

The determination of necessity for an assessment against stock-
holders of banks is not the exercise of a power which is in-
herently judicial but if the State banking commissioner's de-
cision is founded on fraud, bad faith or obvious error a court
may intervene to grant relief in an appropriate proceeding
(Act No. 32, Pub. Acts 1933, as amended by Act No. 95,
Pub. Acts 1933).

3. BANKS AND BANKING—RECEIVERS—TITLE OF ASSETS.

A receiver of an insolvent bank takes title to assets subject to
all existing equities.

4. SAME—RECEIVERS—DEPOSITORS' AGREEMENT—TRUST FUNDS.

A receiver who took over the assets of a bank which had been
reorganized took the assets subject to condition of the de-
positors' agreement providing that the agreement was to con-
tinue for a period of five years at the expiration of which
receiver had duty to close trust fund and distribute its net
profits.

5. SAME—MORATORIUM FUND UNDER DEPOSITORS' AGREEMENT—IN-
TEREST.

Under provision of depositors' agreement, entered into incident
to reorganization of bank, where 60 per cent. of deposit lia-
bility was placed for distribution of stated percentages in
the course of five-year term of agreement and to draw interest
from the date of reorganization according to the rules and
regulations of the bank at a rate not exceeding 3 per cent.
per annum, interest was payable at the same rate as that paid
on new deposits.

6. SAME—ASSESSMENT ON STOCK—DISCRETION OF COMMISSIONER—
FRAUD—FINANCIAL CONDITION OF BANK.

Levy of assessment on bank stock by State banking commissioner
*held*, not an exercise of discretion tainted with constructive
fraud, bad faith, or obvious error, notwithstanding stock-
holders had previously paid a 100 per cent. assessment vol-
untarily and had unsuccessfully attempted to operate the
bank under a plan of reorganization approved by the banking
commissioner, in view of the past history of the bank together
with the financial condition at the time the questioned assess-
ment was levied, showing there were insufficient liquid assets
in both trust and moratorium funds set up by the depositors'
agreement to pay the unpaid claims in the moratorium fund
only (3 Comp. Laws 1929, § 11945).

Appeal from Oakland; Holland (H. Russel), J. Submitted October 14, 1941. (Docket No. 17, Calendar No. 41,362.) Decided December 2, 1941.

Bill by John H. Dawson and others against William B. Detweiler, receiver of First State Bank of Milford, to enjoin collection of stock assessment against the stockholders of the bank. Decree for plaintiffs. Defendant appeals. Reversed.

*George A. Cram* and *Edward J. Fallon* (*Henry M. Zimmerman,* of counsel), for plaintiffs.

*C. Bryan Kinney,* for defendant.

*Glenn C. Gillespie,* for trust fund creditors.

SHARPE, C. J.    This is a suit to enjoin the receiver of the First State Bank of Milford from collecting a 100 per cent. stock assessment levied against the stockholders of the bank as of April 26, 1937.

Prior to July 6, 1931, the above bank, a Michigan corporation, was doing a general banking business in the village of Milford. About this time, because of the financial condition of the bank, the stockholders paid a 100 per cent. stock assessment by way of voluntary contribution to restore the impaired capital stock of the bank. The bank continued to function until April 6, 1932, when it closed its doors.

On May 17, 1932, with the cooperation of the officers of the bank, the State banking commissioner filed a petition in the circuit court for a reorganization, setting up that depositors, representing in excess of 85 per cent. of the deposit liability of the bank, had joined in a plan for reorganization under a depositors' agreement which provided in substance:

STOCKHOLDERS—Voluntarily paid an assessment of 100 per cent. on their capital stock for the pur-

pose of strengthening the capital structure of the reorganized bank.

DEPOSITORS—Agreed that the liability of the bank to all old depositors should be modified as follows:

TRUST FUND—40 per cent. of each depositor's balance (totalling in all $244,044.44), was to be deducted from his account as shown by the books of the bank and allocated to this fund. All assets charged off or being of a value too uncertain to include in the reorganized bank were to be transferred to the fund, for the purpose of liquidating any assets which might be considered questionable and undesirable. If any of the assets remaining in the bank as active assets became doubtful or undesirable at any time during the life of the agreement, the bank might, with the approval of the State banking commissioner, substitute assets of equal amount from this fund to the active assets of the bank, placing such doubtful assets thus removed in the trust fund for the purpose of safeguarding the remaining deposits.

Net profits accruing to the bank were to be credited to the fund and all losses were to be charged to it.

At the expiration of five years the fund was to be closed and the balance distributed pro rata among the depositors entitled to participate therein.

MORATORIUM FUND—60 per cent. of each depositor's balance (totalling in all $366,078.72), was to be deducted from his account and allocated to a moratorium fund, payable as follows: 10 per cent. first year, 15 per cent. second year, 20 per cent. third year, 20 per cent. fourth year, and, 35 per cent. fifth year. Deposits in this fund were to draw interest from the date of reorganization "according to the rules and regulations of said bank at a rate not exceeding 3 per cent. per annum."

NEW BUSINESS—New depositors in the reorganized bank had the right to withdraw their deposits

subject to the usual regulations of the bylaws of the bank.

DEPOSITORS' COMMITTEE—Created a depositors' committee of seven members to act with the directors during the existence of the agreement.

TIME—The agreement was to continue for a period of five years.

The above agreement was approved by the circuit court on June 10, 1932. The new bank reopened its doors on July 1, 1932, and did a general banking business, paying the first 10 per cent. of the moratorium fund deposits within the first year.

On January 25, 1933, the Federal Reserve, of which the bank was a member, caused an examination to be made to determine whether the bank was in a solvent condition. The examiner made the following criticism of the bank in his report:

"Loans reflect a lack of attention on the part of the management and $47,600 of same, approximately 37 per cent., are past due, of which $26,775 are statutory and $14,141 are demand older than one year and no interest paid. The high aggregate of past due reflects very poor credit risks. However, this is partly accounted for due to the fact that the bank was not operating for several months. Loans to directors Hubbell and Vincent [plaintiffs in this suit] are subject to severe criticism and a large portion of each are now statutory bad debts. Loans as a whole are badly frozen, and, unless the price of agricultural commodities shows an increase, larger losses than those estimated will no doubt be taken. Eleven lines aggregating $61,600 are in excess of 10 per cent. of subject's capital—many of these represent over-extensions of credit, and also represent approximately 50 per cent. of bank's total loans exclusive of mortgages."

The examination included the trust fund assets, which were not appraised, however, because there

were none eligible to be substituted in the moratorium fund. Concerning this fund the report concluded:

"No cash available in above assets to remove objectionable assets now carried in subject bank. No accurate estimate of the value of these assets can be made at this time. Mortgages are all past due and portion of same are now Other Real Estate. Over $40,000 of these assets now have no value, representing depreciation on bonds written off."

March 6, 1933, the State banking department also made an examination of the condition of the bank. The examination disclosed $25,000 capital, undivided profits of $233.12, estimated losses of $29,552.24, and a net deficiency of $29,319.12. No appraisal was made of the assets in the trust fund.

On October 24, 1933, the board of directors of the bank requested the appointment of a conservator and in accordance with this request the State banking commissioner appointed Elmer Field as conservator as of October 31, 1933.

In July, 1934, the State banking department advised the conservator that, in its opinion, a receiver should be appointed; and at the request of the board of directors, an order was entered by the State banking commissioner appointing Eugene Carey as receiver of the bank to wind up its affairs and distribute its assets as provided by the general banking laws of the State of Michigan.

Liquidation of the assets of the bank was subsequently carried on under several receivers, during which time no request was made to any of the receivers by moratorium fund creditors, stockholders or depositors of the bank to substitute assets from the trust fund to the moratorium fund and the receivers made no effort to liquidate the trust fund for the benefit of the moratorium fund. The State banking department treated the assets of the trust

department as a trust fund and they were not considered as assets of the bank. On January 14, 1937, the receiver, at the request of the banking department, made an analysis of the assets of the moratorium fund. The analysis disclosed cash on hand of $7,491.46 which with all other unliquidated assets had a book value of $130,368.09 and were classified as follows: good or collectible—$102,077.73. Receiver's receipts and other liabilities amounted to $105,056.25 which with interest at three per cent. amounting to $24,476.23 made total liabilities of $129,532.48.

On April 26, 1937, the State banking commissioner entered an order levying and directing the receiver to enforce the statutory liability of stockholders. Following the levying of the assessment, the receiver commenced suits in the circuit court against certain stockholders, who are the plaintiffs in this suit, to recover assessments levied on their stock. Plaintiffs thereupon filed this bill of complaint against the receiver, alleging as grounds for relief that:

1. There was no justification in law for the appointment of the conservator or the receiver, and the action of the State banking commissioner in making these appointments was founded on fraud, bad faith and obvious error;

2. The assets of the reorganized bank, except for the unwarranted interference of the State banking commissioner, would have been sufficient within the five-year period to have paid the moratorium fund creditors in full;

3. It was fraud, bad faith and obvious error on the part of the State banking commissioner to order the stock assessment of April 26, 1937;

4. Plaintiffs paid their stockholders' liability through their voluntary contribution of a 100 per cent. assessment at the time of the reorganization of the bank.

The bill of complaint prayed that prosecution of the suits to enforce the stock assessment be restrained and upon hearing, the assessments be cancelled and set aside.

Following the hearing, the circuit judge filed a written opinion and found that:

1. The board of directors and depositors' committee were given no choice in the matter of the appointment of a conservator and later the appointment of a receiver by the State banking commissioner, and the department "was obviously mistaken in its conclusions and committed obvious errors in its supervision of this bank, amounting to constructive fraud not only upon stockholder-plaintiffs but also upon the bank's depositors as well;"

2. At the time of the appointment of the conservator and later, at the time of the appointment of the receiver, the reorganized bank possessed sufficient assets, had the trust fund been resorted to, to have paid the 60 per cent. due depositors under the depositors' agreement in full during the five-year period;

3. The stock assessment order was tainted with "obvious error" and "constructive fraud," and, "as a result of such error and/or constructive fraud the commissioner of the banking department found it necessary to sign an order levying and directing the receiver to enforce statutory liability of the stockholders in said bank;"

4. The creditors of the moratorium fund were not entitled to interest on unpaid balances.

The decree entered provided that it was not the intention of the depositors' agreement and the reorganization thereunder on July 1, 1932, that the assets in the trust fund department were to be considered as a separate trust to be administered separate and apart from the reorganized bank; that under the depositors' agreement, holders of mora-

torium department certificates and successor receivers' receipts were not entitled to interest; and that the receiver was bound by the terms of the depositors' agreement and legally obligated to carry out its terms.

Defendant appeals. The order for the 100 per cent. stock assessment of the above bank was made by the State banking commissioner under the authority of 3 Comp. Laws 1929, § 11945 (Stat. Ann. § 23.52) for the purpose of satisfying obligations of the bank to its depositors.

In *McCaslin* v. *Albertson,* 279 Mich. 650, 656, 657, 659, we said:

"By the mentioned legislation [so-called emergency banking legislation of 1933]*, the power and authority to levy an assessment, previously vested in the courts, was thereby transferred to the State banking commissioner.    *    *    *

"The determination by the commissioner of the necessity for an assessment is not the exercise of a power which is inherently judicial. *Emery* v. *Shinn,* 278 Mich. 246.    *    *    *    Had the decision of the banking commissioner been founded on fraud, bad faith or obvious error, it could scarcely be seriously proposed that no court would have intervened to grant relief in an appropriate proceeding."

It is obvious that the principal question involved in this case may be stated as follows: Was the order of the State banking commissioner levying the assessment tainted with fraud, bad faith or obvious error?

The answer to this question must be found in the financial condition of the bank as of the date of the above order, *i.e.,* April 26, 1937, and in the events leading up to the issuance of the order. We are not impressed with the claim of plaintiffs that the action

---

* Act No. 32, § 5, Pub. Acts 1933, as amended by Act No. 95, Pub. Acts 1933 (Comp. Laws Supp. 1940, § 12077–5, Stat. Ann. § 23.95).— Reporter.

of the banking department in appointing a conservator and successive receivers was not voluntary on the part of the bank officials. The record discloses these various appointments were at the request of the board of directors of the bank. It is to be noted that there was no protest concerning these appointments until the receiver began suits to collect the stock assessments. There is an old Scottish saying that, "if one invites a guest, one need not be surprised if the guest accepts the invitation." In our opinion, the "cry of uninvited guest" is too faint to be heard in a court of equity. We have in mind, however, that the depositors' agreement, effective June 10, 1932, and approved by the banking commissioner, is an item to be considered as a receiver of an insolvent bank takes title subject to all existing equities.

In *Reichert* v. *Fidelity Bank & Trust Co.*, 257 Mich. 535, 540, 541, we said:

" 'The receiver stands in the place of the bank which he represents, and has only such rights as it had, so that the rights of third parties are not increased, diminished, or varied by his appointment. He takes charge of the banking affairs where the bank left them, and takes over its assets with its concomitant burdens. In other words, he takes only such title to the assets as the bank itself had, subject to all equities which existed against the assets in the hands of the bank.' 3 Michie on Banks and Banking, § 96.

"See, also, *Thompson* v. *Union Trust Co.*, 130 Mich. 508 (97 Am. St. Rep. 494); *Williams* v. *Johnson*, 50 Mont. 7 (144 Pac. 768, Ann. Cas. 1916D, 595)."

The receiver in taking over the assets of the bank took them subject to all conditions of the depositors' agreement, among which was the provision that the agreement was to continue for a period of five years and at the expiration of this period, it was the duty

of the receiver to close the trust fund and distribute its net profits.

The agreement also provided that the moratorium fund was to draw interest "according to the rules and regulations of said bank at a rate not exceeding 3 per cent. per annum." Our interpretation of this interest claim is that money in this fund would be entitled to the same rate of interest as new deposits, upon which interest was paid. Under the depositors' agreement of May 17, 1932, 10 per cent. of the moratorium fund was payable within a year from the opening of the bank which occurred July 1, 1932. One-half of the first payment of 10 per cent. was paid prior to February 11, 1933, and the remaining one-half of the first payment was paid prior to October 31, 1933. The second payment of 15 per cent. due July 1, 1934, was not paid until after the appointment of a receiver, July 18, 1934. The third payment of 20 per cent. due July 1, 1935, and the fourth payment of 20 per cent. due July 1, 1936, were not paid and under the depositors' agreement, the fifth payment of 35 per cent. became due and payable July 1, 1937, or a little more than two months after the levying of the assessment complained of.

At the time the assessment was levied, we find the financial condition of the bank to be as follows:

"CONDITION OF MORATORIUM AS OF APRIL 26, 1937.

"ASSETS

| | |
|---|---|
| Bills Receivable | $20,815.56 |
| Bonds | 35,770.00 |
| Mortgages | 55,504.44 |
| Other Assets | 160.14 |
| Claims Allowed—Not on Books at Receivership | 122.72 |
| Losses | 15,732.66 |
| Cash on Hand | 16,704.13 |
| | $144,809.65 |

"LIABILITIES

| | |
|---|---|
| Claims—Unpaid | $101,796.45 |
| Preferred Deposits | 734.18 |
| Certificates of Deposit | 2,437.06 |
| Collected on Other Assets Coming into Receiver's Possession | 34.34 |
| Net Income | 4,504.12 |
| | $109,506.15 |
| Capital | 25,000.00 |
| Undivided Profits | 10,303.50 |
| | $144,809.65" |

"CONDITION OF TRUST FUND AS OF
APRIL 26, 1937.
"ASSETS

| | |
|---|---|
| Bills Receivable | $ 13,750.10 |
| Bonds | 103,178.88 |
| Mortgages | 13,514.90 |
| Other Assets | 36,452.07 |
| Losses | 60,582.04 |
| Cash on Hand | 28,873.08 |
| | $256,351.07 |

"LIABILITIES

| | |
|---|---|
| Trust Fund Certificates of Deposit | $242,339.74 |
| Reserve Fund | 10,889.20 |
| Net Income | 3,114.99 |
| Collected on Other Assets Coming into Receiver's Possession | 7.14 |
| | $256,351.07" |

From an examination of the above financial statement, it is readily ascertainable that there were not sufficient liquid assets in both funds to pay the unpaid claims in the moratorium fund.

The discretion exercised by the banking commissioner in levying a stock assessment as of that date must be considered in the light of past history of the

bank, together with its present financial condition. The banking department through the receiver of the bank was in a position to know the values of the bank's assets. The test of its judgment must not be considered in the light of subsequent and improved banking conditions in Michigan. We are unable to find in the record that the judgment exercised by the banking commissioner was tainted with constructive fraud, bad faith, or obvious error; and we are constrained to hold that the trial court was in error in so finding.

The decree of the trial court is reversed and the bill dismissed. Defendant may recover costs.

BUSHNELL, BOYLES, CHANDLER, NORTH, STARR, WIEST, and BUTZEL, JJ., concurred.